No. 13,418.

MRS. WIDOW DENNIS CAMPBELL VS. NEW ORLEANS CITY RAILROAD
COMPANY.

SYLLABUS.

1. An exception to the capacity of a mother suing as natural tutrix of a minor
   child to recover, on his behalf, damages for a personal injury can not be
   pleaded after answer filed.   (Montford vs. Schmidt, 36th Annual, 750.)
2. If an accident happens to a child by its running upon a track in front of
   an approaching electric car no liability attaches to the motorman or his
   employer, if the circumstances were such as were not calculated to cause
   the motorneer in the exercise of proper prudence and caution, to suspect
   that it would do so, and he takes immediate action to save the situation
   the moment its intended course is shown.   (Gallaher vs. Railroad, 37th
   Annual, 288.   Gannon vs. Railroad, 48th Annual, 1004.)

APPEAL from the Civil District Court, Parish of Orleans—*King,
J.*

*Frank McGloin* for Plaintiff, Appellee.

*Denegre, Blair & Denegre* for Defendant, Appellant.

STATEMENT OF THE CASE.

The opinion of the court was delivered by
NICHOLLS, C. J.   The plaintiff brought this suit alleging herself to
be the natural tutrix of the minor Raymond Henry Campbell.

She averred that on the 10th of July, 1899, at from five to six o'clock
p. m., said minor, of tender years, being in the Coliseum Square, a pub-
lic park or place of this city, in the course of his play went upon the
track of the Magazine street line of electric cars, belonging to and oper-
ated by the New Orleans City Railroad Company, when car number five
of said Magazine street line, through the gross carelessness of the motor-
neer, an employee of defendant, ran upon said child, knocked him down
and under the car, causing his right heel and leg to be shockingly

mangled, breaking the bone and leaving the limb hanging only by a shred of flesh, and otherwise bruising and injuring him; that by said injury, said minor was occasioned great and prolonged suffering and pain, physical and mental, and was compelled to submit to amputation of the injured leg, becoming as a consequence, a cripple for life.

That the said injury was due exclusively to the gross carelessness of the defendant company, and particularly of said motorneer, who was not keeping a proper look out so as to see said infant in time to safely stop his car, and so avoid hurting him; that, had said motoneer kept a proper watch and look out, he could and would have seen said child in time to avoid an accident.

That it was her belief and she so charged, that said car was running at a high rate of speed, and beyond that which common prudence would justify and beyond what was allowed by the city ordinances; and that, even though negligent in keeping a proper watch ahead and to the side, still, had said car been going at a slow and proper speed, it might have been checked in time, even by ordinary braking, to prevent an injury so very serious as was done to said minor.

That, in such an emergency, the motorneer should have at once reversed the current, and thereby stopped the car, and so saved the child, or at least occasioned to him less grievous injury, and that said motorneer neglected to reverse the current.

That said motoneer was not competent and careful; and she believed and charged that the brakes and appliances of said car were not in good order and condition, and that the incompetency of said motorneer and defectiveness of the brakes and appliances contributed to the injury complained of.

That, under the ordinances of the city of New Orleans, and under the general obligations of defendant to safeguard the public, said car should have been provided with a proper fender; that, as a matter of fact, it was not provided with such fender; that the car struck said child standing, and had a proper fender been on the car, he would have been probably thrown away from and clear off the car and track; that, instead, he was knocked down under the car and under the wheels.

That said minor was damaged by the action of defendant company in the full sum of twenty-five thousand dollars, being ten thousand dollars for pain and suffering, physical and mental, and fifteen thousand dollars for loss of leg, whereby he was made a cripple for life, and

whereby he was rendered less capable of earning a livelihood during the remainder of his earthly existence, for which sum he was entitled to judgment. She prayed that defendant be cited; that a jury be empanelled to try the cause and that in due course, defendant be condemned to pay said minor, through petitioner as his tutrix, twenty-five thousand dollars, with legal interest from date of judgment.

Defendant answered substantially by a general denial.

During the course of the trial defendant offered as part of its evidence the record in the matter of the minor Raymond Henry Campbell, on the docket of the Civil District Court for the Parish of Orleans. Plaintiff objected to the offer until some purpose was shown for offering it. Defendant thereafter stated that the suit was brought on behalf of the minor by the plaintiff as tutrix, and the record was offered to show that the proper steps required by law to qualify her as tutrix, had not been taken.

Plaintiff objected to the introduction of the evidence on the grounds:

1st. That it was entirely irrelevant.

2nd. That defendant had not put the question of capacity at issue by an exception filed *in limine.*

3rd. That the filing of a general denial is a waiver of any objection to the capacity of the party plaintiff.

4th. The defendant had no interest to question here the legality of the appointment by another court of a tutrix to represent this minor child.

5th. Even if defendant had any interest it could not impeach the action of a court of competent jurisdiction appointing the representative of a minor collaterally; that the only manner in which the correctness of the judgment of the court appointing a tutor can be questioned, is by appeal or direct action to annul it.

The court sustained the objection on the ground that an objection to the capacity of the tutrix to sue, must be urged by way of exception before the answer is filed; that the filing of the answer admitted the capacity to sue; that at any rate defendant could be amply protected in the event judgment should be rendered before the payment of the money, to which ruling defendant excepted.

The jury by a vote of nine to three returned a verdict in favor of the plaintiff against defendant, for five thousand dollars.

Defendant appealed.

Plaintiff on appeal prayed that the judgment be amended and increased to cover the full amount claimed in the petition filed.

## OPINION.

This suit is brought by Mrs. Albertine Noamie Labauve, widow of Dennis Campbell, alleging herself to be the natural tutrix of the minor Raymond Henry Campbell, to recover for and in behalf of the minor, damages for personal injuries received by reason, it is claimed, of the negligence of defendant's employees.

During the trial of the cause defendant objected for the first time that the plaintiff had not taken the proper steps to have authorized her confirmation as tutrix, and she was not authorized to appear in that capacity. The court overruled the objection on the ground that the objection came too late, it having been raised by issue joined on an answer, and that defendant would be still in time, if judgment were rendered against it, prior to payment thereof, to see that the legality of plaintiff's position as tutrix should have been placed beyond the possibility of doubt.

*We think the court's ruling correct.* (See Montford vs. Schmidt, 36 Annual, 750.)

The gravity of the injury received, coupled with the fact that the party suffering the same is a little child, has caused us to examine the testimony in this case with the greatest care. There would be no difficulty as to the law of the case with facts established with certainty, but we have found in the present instance, the same looseness of expression and indefinite ideas as to time and place as is found in nearly every suit for damages for personal injuries, where the persons injured and the objects injuring are moving bodies.

It is no uncommon thing for witnesses in a case like the present, to testify in perfect good faith to certain matters as having occurred several "minutes" after each other and of having taken place ten, fifteen and twenty "feet" of a given place, when it is perfectly manifest to a court critically examining the whole that seconds should have been substituted for minutes and inches for feet. There is no class of actions where correct conclusions as to the legal consequences of acts are so dependent upon exact time and exact place of occurrences as that involving railroad accidents. The evidence shows that between five and six o'clock of the afternoon of the 10th of July, 1899, five children of

the plaintiff's—Eva, sixteen, Albert, eleven, Victor, eight, Mollie, ten, and Raymond, between five and six years of age were in Coliseum Square amusing themselves.   The youngest child, Raymond, went shortly after this upon the track of the defendant company on Camp street next to the square, and in front of one of its electric cars coming up from Canal street, was knocked down and passing under the car had his leg so injured by one of the wheels as to necessitate amputation near the hip.

Neither the extent of the injury nor the fact that it was received by the child's having been run over by one of defendant's cars operated by its employees is disputed.   The issue for decision is whether the injury was the result of negligence on the part of the employees giving rise to legal liability for damages by the defendant.   We leave out of view any question of contributory negligence on the part of the child itself.

The park in the city of New Orleans known as Coliseum Square is an irregular body of land bounded on the side next to the Mississippi river by a walk fourteen feet wide covered by Schillinger paving; adjoining this walk and nearer still to the river was a space of ten feet running parallel to the walk which is sodded with grass and having trees at different intervals in the centre of the same.

At the outer edge of this grass plot is a curbing forming the inner or what is known as the "wood" side (or line) of Camp street.   The defendant has two lines of track upon Camp street.   The rail of the track next to the square is at a distance of a little over two feet from the curbing we have just referred to, so that the distance from the edge of the square proper to the front rail is a little over twenty-six feet.   Coliseum Square is itself sodded with grass and in the square about ten feet from the Schillinger walk are a line of small trees and benches.   On the afternoon in question an old gentleman by the name of Middleton was seated on one of the benches when these children going into the square seated themselves by him.   They soon left him, however, going to another bench which was some distance below and nearer Canal street and possibly a little further back from Camp street than that on which Middleton was sitting.

Some of the children commenced playing a game called "catcher," which it seems called for a good deal of running about, but whether the youngest child, Raymond, took part in this game, at any time, does not appear.   He finally found his way to the railroad track and was run over as stated.

The witnesses on behalf of the child were his mother, Mrs. Campbell, his sister Eva, his brother Victor, Louis Beauvais, J. A. McWhirter, M. Switzer, A. E. Marion, and James Haney. Of these Eva Campbell, Victor Campbell and Beauvais alone claim to have any knowledge of the condition of things just preceding the accident.

Eva Campbell, the oldest of the children, a girl sixteen years of age, testified that she was present on the occasion when a car of the Magazine line injured her brother; she was near the Camp street side in the square; she gave a description of the Schillinger walk; the grass plot beyond and the situation of the car tracks. She testified that she was (at the time) about five feet from the Schillinger walk (referred to frequently by the witnesses as the "culvert"), that she had her little sister Mollie with her, also her brothers Albert, Victor and Raymond; that they were all playing at first in the portion of the square lying between Terpsichore and Robin streets (the former being the street nearer Canal than Robin street) and a little nearer Robin than Terpsichore.

Being asked to explain to the court how her brother happened to get in front of the car—how it hurt him, and everything she saw, she said he was running after a butterfly and he had just put his foot on the track when the motorman hallooed to him and he got frightened and the car struck his head; the board under the car, way under the wheels. Her brother was in the square when he first saw the butterfly up in the tree, and when it flew away from the tree it flew toward the track and he followed it; he went up town; she heard the motorneer halloa and he was struck by the car; she heard the motorneer halloo a few minutes before he was hit; the car was about ten feet from him when she heard the motorneer halloo; about ten feet; her brother was in the track; that was the first halloo she heard; the child was standing when he was struck and he fell down; the child was running slowly up towards Robin street up town and towards the track; he did not run very fast, he was keeping up with the butterfly.

Being asked what first called her attention to the fact that her brother was in danger she answered: "Well, she was watching him." The question was repeated, and she answered: "Well, the motorneer hallooed to him." Being asked whether she first knew of her brother's being in danger by the motorneer's hallooing, she answered: "No, the car was coming so fast he did not have time to get off the track, but the

first time she thought he would be run over was when she heard the motorneer halloo, and the car was coming so fast he did not have time to get off the track; she noticed how fast the car was coming after the motorneer shouted; she was watching him (her brother) all the time; when the children first went into the square they were playing, when her brother commenced going after the butterfly she stopped playing; she was noticing her brother; he was chasing the butterfly, up-town towards Robin street; he ran towards the track; she heard the motorneer halloo and at the same time she saw the car coming fast and he (her brother) was immediately afterwards struck by the car; he had not stopped when the motorneer hallooed to him; he had not got very far on the track, when he did so, he got bewildered, he was not struck just as the motorneer hallooed but sometime afterwards, the child was chasing a butterfly and he ran towards the track.

She was playing on the ground before her brother began to chase the butterfly; she was on the "wood" side of the "culvert" (the Schillinger walk) about the middle of the square, but nearer Robin street; one or two houses above Dr. Levy's house on Camp street. The car was going up town from Canal street up to Carrollton (on the track next to Coliseum Square); there were other children playing in the square.

Before passing to other testimony it will be noticed that this witness, who was the oldest of the children, if not specially in charge of them, places herself at the time of the accident, about five feet inside the square and next the Schillinger walk or the culvert; that she was watching her brother; that she did not discover he was in any danger until he got upon the track and made no attempt to check or stop his doing so; and that whatever did occur was not a matter of "several minutes." As she stated, he was chasing a butterfly and in doing so running up town "slantingly" towards the track, but she does not attempt to fix the degree of the slant, nor show that it indicated that the child was about to cross over even to the Schillinger walk, still less to and across the grass plot beyond and over on to the track, and we shall see later by Middleton's testimony that the child's course was not such as to give rise to alarm or any apprehension. It was only at the last when he made a direct turn towards the track that any one would or could have anticipated danger.

Victor Campbell, a child of eight years and brother of the injured boy, was placed upon the stand. His testimony was that he was present

when his brother was hurt; that his brother was playing before he got hurt; he was running after a butterfly when he got hurt; he was running up town; ran slanting towards the track, and towards up town, he put one foot on the track, the front of the platform hit him, first, and the plank in front of the wheels hit him afterwards; he fell down; witness heard the motorneer halloo to him when he was about ten feet away. The children were all in the square when his brother began to run after the butterfly, on the river side (Camp street side) of the square, on the "wood side" (square side) of the culvert.

He was about ten feet from the culvert. His brother first saw the butterfly in a tree, it flew from the tree going uptown, it flew the same way his brother ran, his brother followed it slanting uptown, his brother was not running fast, only walking fast. Witness did not himself chase the butterfly. Just before his brother saw the butterfly the other children were playing catcher, but not with his brother; he was sitting on the bench.

Witness stopped playing when his brother started to run after the butterfly; his brother called to him: "Vic, I see a butterfly up in the tree," and chunked at it, and witness stopped playing and watched him run after the butterfly; witness did not run after it himself. He first knew his brother was in danger when the motorneer hallooed.

There was an old gentleman sitting there on the bench; witness did not hear him tell him not to run towards the track; the bench where the old gentleman was sitting was pretty near to where they were playing; they were playing further uptown than Dr. Levy's house, the bench is further uptown, he did not know how much. His brother ran about ten feet—from the time his brother started until he got run over he ran about ten feet.

The children were in the square—not on the Schillinger walk, they were near a bench in the square and his brother started to run from there towards uptown and the track; the tree was right at the bench, the bench was leaning against the tree.

Beauvais, one of the witnesses, was a passenger in the car which ran over the child; he occupied one of the front seats of the car on the side next the square, and was looking out of the window. He said there was no difficulty in approaching the place where the accident occurred, in seeing ahead. There were a few trees, but they would not obstruct the view; there was a clear view before coming to the spot.

His version of the accident was that it occurred in the afternoon, a little after five o'clock. Just as the car got above Terpsichore street he saw a child on the street; about ten years of age he judged, and he started to run across the track after a little girl or boy that preceded him across the track, and when this little fellow started across the track after the little girl or boy he guessed he was about 90 feet from the car at the time; the boy had started to cross the track, he was going in the direction of Dr. Levy's house, the accident happened about two doors above Dr. Levy's house, and the motorman slackened up when he saw the child and rang his bell, and that seemed to startle the child, and he stood perfectly still until the car struck him; witness did not think the motorman stopped the car when he first saw the child because he was quite a distance away. When witness first saw the child the motorneer rang his bell and started to stop the car—that is, slackened his speed, supposing that the child was going to get off the track, and finally put on the brakes to stop the car three or four feet away, then he put the brakes on strong and tried to stop the car; did not know how fast the car was going when he (witness)' first saw the child.

On cross-examination witness said that shortly after the car left Terpsichore street he was looking ahead and saw a child.

Q.—You saw a child on the track, did you say?

A.—Yes, sir; he started to cross the track.

Q.—At a distance that you judge to be about ninety feet from the car?

A.—I thought that was about it—I never measured the distance.

Q.—Then the motorneer began to sound his gong and to put on the brakes?

A.—Yes.

Q.—Just as soon as he became aware that the child was not going to get off the track he did his best to stop the car?

A.—Yes.

Q.—When he rang the bell, instead of that making him get off the track it frightened him? It caused him to stop?

A.—Yes, I think it frightened him, he remained perfectly still until the car struck him. .

Q.—The boy was struck just above Dr. Levy's house?

A.—I believe just two doors above.

Q.—Which way was the boy running?

A.—He started to cross the track—right across the track.

Q.—Right across it at right angles?

A.—Yes, started in the direction of Dr. Levy's house—that is just across the street.

Q.—Were you looking right straight ahead?

A.—Yes.

Q.—And the first time you saw this boy running was when he started to cross the track?

A.—Yes.

Q.—Now he (the motorneer) stopped the car almost immediately after striking the boy?

A.—Yes, within a few feet.

Q.—He made a very good stop?

A.—I don't know what you mean by a good stop. I suppose he stopped as quick as he could.

*Re-direct.*

Q.—You state that he did not put the brakes on full until he was almost upon the child—when did he put the brakes on full?

A.—I said he put the brakes on when he thought the child was not going to get off the track, and I judged that to be a very short distance before striking the child.

McWhirter, one of plaintiff's witnesses, was a passenger in the car but seated on the opposite side from the accident. His attention was first attracted by the putting on violently of the brakes and the screaming, the next moment, of the child. It was done almost in a moment; there was no difficulty in seeing the square for some distance approaching it; there were some trees on the grass strip which lies between the culvert (the Schillinger walk) and the street; witness did not think the car had gotten under full headway yet; would not say the car was running at unusual speed, heard the gong ring.

Switzer, one of plaintiff's witnesses, was a passenger in the car, was preoccupied at the time, was startled by the furious ringing of the bell, looked up—saw the child, from the waist up, in front of the car, he saw the car strike him, saw the motorneer put on his brakes at the time, and heard him say "too late—too late!" It could not have been more than a second from the time he saw the child until he was struck.

Marion, one of plaintiff's witnesses, was also a passenger in the car, seated on the side next the square; when the car got near the corner of

Robin street his attention was attracted by the excitement of the motor-neer putting on the brakes, at the same moment he saw the child, he could not tell the distance—practically at the same moment, the motor-neer was using his best efforts—putting the brakes on quick and hard.

Haney, a witness for plaintiff, was a passenger in the car, did not see the accident, heard the excitement of voices, looked up—saw the motor-neer putting on the brakes, he seemed very active. After the accident, stepped off the distance from where he first saw blood on the track to where the car had stopped, and the child was released from the car; that was thirteen steps, he judged about twenty feet, there was not a trail of blood all along but blood at different paces, he could not say it was from where the child was hurt—he did not see where the child was hurt.

The first witness placed on the stand by the defendant was Middle-ton, the old gentleman who has been already referred to as sitting on a bench in the square at the time of the accident. After stating that fact he said he saw the children, they were sitting on the same bench he was occupying, but they got up and went further back and took another bench to play on; further downtown.

A few moments after they occupied the other bench, this little boy that got crippled strayed off, at least ran away from his playmates; he started to cross the track and I hallooed to him and told him to come back; that the car would run over him, and he ran sort of diagonally across the track, and when witness hallooed to him he was right on the track. He supposed the child did not hear him, but something or other seemed to attract his attention and he started back, and when he got about the centre of the track he stopped perfectly still, and seemed to be bewildered, and then the car was right on him. When the child started to cross the track he was running.

The motorman rang his gong the first thing and put on his brakes, with his left hand; he seemed to be putting on the brakes with both hands, but just before the car struck the child, he had his right hand loose with his left hand on the motor—on the brake, and the front wheels were sliding and he grabbed for the child. At the time he grabbed for the child witness grabbed for it; when the child fell he fell on his face.

It could not have been over two lengths of the car when the boy start-ed to cross the track, thirty to forty feet as nigh as he could judge, he

never measured the distance, but as near as he could judge; did not know what the length of the car was, supposed it was about thirty to forty feet.

The bench on which witness was sitting was very close to the culvert, it could not have been more than eight or ten feet. The children were not playing at the time of the accident, around him. When he sat down on the bench they were playing on that bench, but they all moved further downtown to another bench. They all went down, it could not have been over a hundred feet from one bench to the other, as far as he could judge; in a sort of oblong way, on a line parallel to the bench on which he was sitting.

The boy came and sat on the bench which witness was occupying for a moment, and then he broke off and ran to the bench where the other children were playing, and then he ran back, and stopped a second or two at the bench on which witness was sitting, and he broke right away and ran across the track.

The bench on which witness was sitting was about ten feet from the culvert as near as witness could judge.

*Plaintiff's Counsel—*

Q.—You say he started diagonally toward Robin street?—in this sort of a direction, and he only stopped a second or two at the bench at which you were sitting?

A.—He only stopped for a moment and then ran off.

Q.—And then it was practically one run—was it not?

A.—Yes, you could call it one run.

Q.—From the bench below you a hundred feet off which was practically one run?

A.—He checked up for a second or two on the bench where I was seated and then broke off and ran across the track.

Q.—And that was practically no interruption to his run?

A.—No.

Q.—And then he went directly in a diagonal direction from where you were sitting towards the track?

A.—Yes.

Being asked questions concerning the car witness said he first saw the car at the street below (Terpsichore street); didn't know whether it checked up, but it seemed to come to a little stop; he noticed it begin to check up when the gong rang, about thirty to forty feet from the child

—that is to say, the motorman was thirty to forty feet away, he rang his gong then and put on his brake—could not swear to the distance, but as near as he could judge, it was thirty or forty feet; it might have been something more—something less.

The motorneer put on his brake fast and strong, he could swear to that; he did all he could to stop the car; witness followed the child right up and helped to take the child out. Witness was sitting on the bench when he hallooed to the child, the distance from the bench to the centre of the track—called to him when he started to cross the track and told him to come back; that the car would run over him, and he ran sort of right on the track.

Witness did not move from the bench until he called and he (the child) seemed to be perfectly bewildered, and then witness ran as fast as he could, for an old man of his age, and put his hands on him. Witness did not have time to put his hands on him before the car struck him; it struck him before he got to him; witness was within eight or ten feet of him when he was struck.

Asked when first he saw the child was in danger he answered: that he saw the child was in danger as soon as the gong rang. As soon as the gong rang he saw the child was in danger, that was about thirty or forty feet off—the car dragged or pushed the child ahead a little, from four to eight feet he should judge; the motorneer put his brake forty feet or somewhere about that before he struck the child.

Reems, a witness for the defense, was a passenger in the car, seated on the side next the square; he testified that he first saw two boys running across the square, one was a little taller than the little fellow that was run over, and they clasped hands running across the square, and the little fellow broke away from the elder boy and had crossed the track and was pretty near the centre between the two tracks, when he probably got excited at something, and started to run back toward the square.

The motorman put on the brake and stopped the car, but it was too late; he shut off the power and put on the brakes as quick as he was able and tried to avoid the accident—that was his opinion. The boys were running toward the track, they did not stop—they kept right on running and the little fellow broke away from the elder boy and proceeded to cross the track; witness thought there was, in the meantime, a wagon coming down and he (the child) turned back. The wagon

was thirty to forty feet ahead of the car, coming down (Camp street) at a pretty fast rate.—

*Plaintiff's Counsel*—

Q.—You saw it very plainly and the motorman could have seen it without any trouble, if he had been looking ahead?

A.—I don't know if he could.

Q.—And this little boy was coming across the track, and when he saw this wagon coming he got frightened and turned back?

A.—Yes.

Q.—You have been giving your opinion that the motorneer could have seen it if he was not blind, and was looking ahead?

A.—Yes.

Q.—If the boy had gone on would he not have been run over by the ice wagon?

A.—I suppose so. The boy was in front of the car crossing when I first saw the wagon.

The witness testified that the car stopped at Melpomene street and continued on its way up; that the motorneer saw the boys running towards the track; he put on the brakes also and slackened up the speed of the car, and when he had slackened up the speed he put the power on again and continued on his way up. He thought probably the road was clear.

This witness had been examined as a witness on a preliminary examination of the motorneer, Larmieu, before the First City Criminal Court, charged with assault and battery in having run over the child. On that occasion he testified that the boys were running across the street between Terpsichore and Robin streets. One of the boys was much taller than this little boy, and the motorneer saw him coming along and he checked his car up in front of the church, and as he saw the boy had stopped on the grass plot in the square, in front of Dr. Levy's residence, he stopped there for a moment and then he started off again, and with that the little fellow broke away from his friend, and ran on in front of the car.

There was a cry and a shout in the car, and a wagon was coming down the street, and in the excitement he noticed the wagon and ran back, and ran in front of the car.

The counsel of defendant who had a copy of this testimony in his possession, read from it in court, calling his attention to differences be-

tween his two statements, and asking him which was the correct one. He answered that "the first one was from the standpoint that the child had broken away"—that he had not been well for three weeks and had not thought of the matter.

On cross-examination by plaintiff's attorney the witness said he saw distinctly between Melpomene and Terpsichore streets the group of children in the square; the motorneer could have seen them had he been looking in that direction; witness saw two children cross the square, they ran hand in hand across the square, starting from the centre of the square near the fountain, they had their hands joined when he first saw them—about twenty feet from the fountain; they ran hand in hand directly towards the track until they came to the grass strip between the culvert and the railroad track, and there they parted hands.

The car was then ten feet away, the car had come up to within ten feet of the boys, who had hands clapsed when they turned loose their hands and ran across the track; the little fellow jerked himself loose and kept right on, and the other boy remained on the side of the track; the car was running at a very slow gait; the motorneer, he supposes, did not put on the brake until he actually struck the child; the boys were three feet from the track and the car was ten feet away; the little boy kept on running across the track and he turned back and was struck by the car.

Skofield, the conductor of the car, testified that just above Terpsichore street he gave the signal to stop at Robin street to let Mr. Strouss get out; he did not notice anything until he felt the tightening of the brakes, all of a sudden, and the car all of a sudden came to a sudden stop; it was a good stop, could not have been made better by any one else; the car after it stopped, was backed about a foot to extricate the child and keep it from getting hurt by the life guard.

The motorneer put on the brakes when witness gave him the signal; he felt the application of the brakes and he thought he was slackening up for the corner, and then the car stopped instantly, the car went on about the distance of about fifty feet after he had given the signal, before the brakes were put on quick and fast.

Strouss testified that he had touched the bell to put him off at Robin street and was walking back in the car to get out, when the accident happened; he heard the conductor ring the bell in answer to his button call, the motorneer started to slacken up when witness rang the bell,

just about the space of time it takes to go a few feet; the interval between the putting on of the brakes and the jolt of the car was nearer two seconds than two minutes.

The testimony of Larmieu, the motorneer, was to the effect that as the car reached Terpsichore street, he got a bell to stop at Robin street. When he got the bell he turned off the current and checked up the slack of. the brake; when he was about the middle of the square two boys ran from behind the trees; the oldest boy was in the lead and the youngest came right behind him—about five feet; witness halloed to them and the oldest boy managed to get back when he halloed, but the little fellow did not; witness checked up the brake but it was too late; the car was right on top of him, he made a good stop; when he hit the little fellow the car went thirty or forty feet. Witness (the car) was ten feet from the children when they came on the track ahead of the car; they came from the woods side running towards the river, from the square. Witness was looking straight ahead at the time. The trees he spoke of that the boys came from behind were trees right close to the track, between Terpsichore and Robin streets.

Witness, in answer to a question on cross-examination whether when he passed Coliseum Square he kept looking ahead all the time, said "Yes," and the question being repeated: "never looked across the square?" replied: "I was looking straight ahead". Being told that it had been shown by the testimony in this case that this group of Campbell children were in the square, and asked whether he had seen them, he said that he had not, it must have been the trees that kept him from seeing them. The first witness saw of the children (the two referred to in his testimony) was when they came from behind the trees on the strip of grass between the culvert and the street proper, on a run; "he no more than saw them than they were on the track;" the first thing he saw was the two children running on the strip of grass.

Just as soon as witness got the bell to stop he began to put on the brake, he shut off the current and took up the slack of the brake; the taking up of the slack does not put the brake on of any consequence; the braking proper hard and fast he put on just as the child was starting on the track, the child was about ten feet ahead on the track when he put the brake on; the car came to a full stop in between thirty-five and forty feet, the child was dragged some, the car was going at a pretty fair speed. Witness first saw the little boy who was injured

coming right from behind the trees to the track, about five feet from the track.

After considering the whole testimony in this case, of which the extracts which have been recited are the most important, we are satisfied that the appliances of the car were such as they should have been, that the motorneer made every possible exertion to stop the car from the time the child commenced crossing to the track from the green on the outer edge of the culvert, and that it was, in point of fact, stopped just as quickly as it was possible to do so with the car running at the rate it was. The crucial questions in the case are—was the rate of speed at which the car was moving too great, in view of its passing a public park, or under the circumstances of this particular case; and second— Did the motorman see the child and its danger as soon as proper diligence required, and care called for his seeing him.

Counsel of plaintiff insists that the motorman was guilty of gross negligence in looking as he says "straight to the front"; that prudence and care required that in passing a public square, he should look equally to the sides. We think he holds the motorman down too strictly in his use of the words, he was "looking straight to the front". He obviously meant the field of vision taken in and included in an ordinary view and he so explained himself, for in answer to the question— whether, when he was looking straight ahead, he could not see to some distance on either side, he answered "Yes." (See Sciortens vs. Crescent City Railroad Co., 49th Ann. 7, on this point.)

One of the most frequent complaints brought against motorneers is that they are looking to the side instead of towards the front as they should. As to the speed of the car, there is no evidence whatever of its having been run below Terpsichore street (or in fact anywhere) at an unusual or improper rate, and the testimony is that just after leaving Terpsichore street the motorman threw off the current and took up the slack of the brake, not, it is true, as a matter of precaution against possible accidents from passing a public square, but because of the signal given for the putting off of a passenger at the next street (Robin street).

The fact itself of the slacking up of the speed of the car by the turning off of the current, and not the particular motive or occasion for this being done is what we have to consider here. · It is true that the taking in of the slack of the brake did not carry with it, it is said, any ma-

terial stopping of the car—but the motorman was in the exact position needed to take immediate action, in case of an emergency, and this he seems to have done.

We have now to direct our attention to the contention urged that the motorman did not see the child as quickly as he should; plaintiff claims that he made a continuous slanting run of over sixty feet towards the track, that the motorman should have seen him from the starting point, and had he followed him with his eyes he would have seen immediate prospective peril and danger, but we do not understand the evidence as plaintiff does; it is quite true that the child ran some distance uptown, that is to say, from the second bench to which the children had gone, and the upper bench where Middleton was sitting, but this course was almost parallel to the Schillinger pavement and would give rise in no one to an apprehension that the child would turn to the left, cross the culvert and the grass strip beyond on to the track, and this is what he seems to have done. He ran from the lower to the upper bench, stopped there for a moment and then ran across the culvert and grass strip to the track.

We do not think that prior to this action there was any ground for suspicion that he would turn and go upon the track. Neither his sister Eva, nor his brother Albert seems to have entertained any fear on that score, and when the child did turn to the left he moved so quickly and the distance was so short that Middleton did not appreciate the danger until the child got actually upon the track.

We do not think we would be justified in putting the danger point back of the turning of the child to the left from Middleton's bench, and we do not think there was anything in the situation even then which was calculated to have directed the attention of the motorman at once to the possible action which the child would take thereafter. There is a portion of the evidence which has perplexed us not a little. It is the introduction into the drama of a second boy by Beauvais, Reems and Larmieu. No other witnesses refer to him. Who he could be we can not imagine unless it was the child's brother Albert, who for some reason was not placed upon the stand. We leave him entirely out in reaching our conclusions.

We think that the motorman acted as promptly as he could under the circumstances and that this case shows one of those deplorable and distressing accidents which as to legal consequences are controlled by

the principles announced in Gannon vs. Railroad Co., 48 Ann. 1004; Kline vs. Railroad Co., 23 Ann. 729; Montford vs. Schmidt, 36 Ann. 750; Gallaher vs. Railroad, 37 Ann. 288; Schneidau vs. Railroad, 48 Ann. 867; Culbertson vs. Railroad, 48 Ann. 1376; Sciortino vs. Railroad, 49 Ann. 7.

In the first mentioned case we said: "The car was being driven slowly—the driver had his hand upon the brake prepared to act as soon as anything should arise calling for action.

"It would be utterly unreasonable to exact that the mere presence of a child of five or six years old upon the sidewalk or banquette with a basket upon her arm, should force the driver of a street car to come to a dead halt upon the bare possibility that it would leave the place it was then occupying securely to either walk or run suddenly into danger * * * We can not say, under the evidence, that he did not act as promptly as the occasion called for. There was certainly little time for action."

The same remarks find application here. The facts of this case differ from those in Barnes vs. Railroad, 47 Ann. 1224, and Rice vs. Railroad, 51 Ann. 114, and Nelson vs. Railroad, 49 Ann. 499.

We can not permit our sympathy to control our judgment. We have no alternative but to reverse the judgment. For the reasons assigned, it is ordered, adjudged and decreed that the verdict of the jury be set aside and the judgment of the court thereon rendered be and the same is hereby annulled, avoided and reversed, and plaintiff's demand rejected and her suit dismissed.

Rehearing refused.