Statement of the Case.
MONROE, J.
Plaintiffs sue to recover tbe damages resulting to them by reason of tbe death of their little ■ daughter, about two years and eight months old, who was killed by one of defendant’s cars; tbe facts of the case, as disclosed by tbe evidence in tbe record, being as follows:
Plaintiffs came into Alexandria, from the country, on January 1, 1907, bringing with them four children under 6 years of age, viz., two boys, tbe little girl who was killed, and an infant about 13 months old. Whilst the father was engaged elsewhere, the mother, *1064 with the children, went to Koorie’s store— situated about the middle of the block, on Monroe street, between Sixth and Seventh, and seated herself, with the baby in her arms, in a chair either in or just outside the front door, where she could see the children, who just before the accident, with two of Mr. Koorie’s children, were playing on the sidewalk a little farther along, in the direction of Seventh street. Monroe street, it may be stated, is 32 feet wide between the curbs, is paved with gravel, and has a street railway track 4 feet wide, running through the middle of it so that the roadways on either side of the track are each 14 feet wide; the sidewalks being each 10 feet wide.
The car which inflicted the injury was 29 feet long and weighed 15,000 pounds. It was propelled by electricity, and came into Monroe street at Fourth, the machinery being so adjusted that it could not be made to attain a greater speed than 8 miles an hour, at (or about) which speed it was moving when the motorman first saw the little girl. Shortly after the car had passed Seventh street, the little girl, being then on the sidewalk, at a point, say, 45 or 50 feet in front of the car, suddenly ran towards the other side of the street, obliquing in the direction of the approaching car. The testimony of the mother as to her movements is as follows:
_ “The child was playing, and they had the two little girls in a wagon and were piajdng between the stores. I took a seat to watch them —that they did not go on the street — and she took a notion to come back to me and run across the street and I saw her, and she was just leaving the sidewalk. * * * I don’t know if she was in the alleyway, between the stores, or come out on the sidewalk, playing. She was there when I first saw her and heard the street car coming, and then I looked for her, and when I saw her she was leaving the sidewalk in a run. * * * She ran across the street — the tracks, you know — and the street car, it was coming down this way, and she ran to get across. She did not run straight across, kind of catacornered across — angling across. * * * I saw her go from the sidewalk in a run. * * * It [the car] must have been 45 or 50 feet, no less than that [from the child]. * * ♦ She never stopped. She kind of came to a halt, in running so fast, when she was right close up to it. She did not stop. * * * I had taken a seat in front to watch, the children and hear the car coming, and looked to see when she started across, and, when I first saw her, she was leaving the sidewalk, and was going in a run. * * * Q. And the child went, in a run, towards the center of the street? A. Tes, sir.”
The motorman says:
“When I first noticed the child it was playing on the sidewalk. I never paid particular attention knowing it was in perfect safety. The next movement [possibly moment] I noticed the child had left the sidewalk, and was attempting to cross the street. * * * The child came running towards the car, across the street. I was within 15 feet of the child. Of course, I endeavored to stop my ear and used every effort to stop it. Anyway, I could not stop it before running over the child. * * * If it had been my mother I could not have done any more.”
The evidence shows that, under the most favorable circumstances (i. e., if, for the purposes of an experiment, the motorman had been warned that he would be called upon to stop the car within the shortest possible distance), the ear could not have been stopped within less than 30 feet, and that a stop within 45 feet, from the moment of an unexpected call, is as good as can reasonably be hoped for, the difference in the distance representing but little more (in the case of a car running at 8 miles an hour) than one second of time. Taking the testimony of the mother of the child and of the motorman, in connection with other testimony relating to the matter, it appears that the car was stopped within 40 feet or less from the moment that the motorman saw the child running towards the track, which (it being shown that the car and its appliances were in perfect order), was all that could be done. There were several witnesses who saw the child, for the first time, on the track, within a few feet of the approaching car, and who testify to the efforts of the motorman to stop the car. There were none who even suggested that it was possible for him to do so, at any time between the moment when the neces *1066 sity became, or should have become, apparent to him, and the moment when, having slipped on the further rail, the child was run over. The motorman was 17 years and 3 months old, at the time of the accident; his height was 5 feet 9% inches; his weight, between 140 and 150 pounds. He had the appearance of a man, and, before entering into the service of the defendant company, had been doing the work of a man on a farm. He had been in defendant’s employ for about five months before the accident; four months as conductor, during which time he had had some instruction and experience as motorman, and one month as motorman. He was intelligent, alert, and physically capable.
A witness for plaintiff testified that he was on the rear platform of the car, and that he saw a colored man in the street in front of the car raising his hands, and heard him shout. Whilst, however, there were several witnesses who were in better positions than he to see and hear what took place in front of the car, none of them, not even the mother of the child, saw any one acting in the manner referred to, and we are satisfied that no 'raising of hands or shouting was done by any one in time to have averted the accident. Mrs. Oloud herself testified that she called or “hollered,” but she did so, not only after the child had left the sidewalk “in a run,” but after she had had time to realize that ic was running to its death, which was too late, and she says:
“I don’t know whether anybody heard me, or not. I may not have hollered as loud as I thought I did; I was hurt so bad. * * * I was hollering to anybody that would help me to stop it.”
There was a verdict and judgment in the district court, in favor of plaintiffs, in the sum of $5,000. Defendant has appealed.
Opinion.
Counsel for plaintiffs rest their case upon the propositions, that it was gross negligence in defendant to intrust the control of a car, propelled by electricity through the streets of a town, to “a mere stripling of a boy, without age or experience”; and that, in view of its negligence in that respect, “all the presumptions are against the railway company.”
Conceding, arguendo, that an older and more experienced person should have been selected for the position of motorman, the fact remains that, no matter how old the motorman might have been, or how experienced, he could not, instantly, have stopped the ear here in question, weighing 15,000 pounds and moving at the rate of 8 miles an hour (or between 7 and 8 miles); nor, as we conclude from the evidence, could he have stopped it between the moment at which the necessity became, or should have become, apparent to him, and the moment at which the child was run over.
From the time that he saw the child approaching the track, the situation was such, so far as he was concerned, that no human agency could have averted the tragedy. There was, therefore, no causal connection between his acts, or omissions, within the period mentioned, and the death of the child.
Counsel say, in their brief:
“Casteix [the motorman], not having seen the child get off the sidewalk of course did not know how long it had been in the street, when he saw it there. The fact that he did not see the child leave the curb is of great importance, because it shows that he was not paying proper attention, and it is fair to presume that he could have stopped the car and saved the baby’s life, if he had seen her when she started across the street.”
The motorman, however, saw the child (as did the mother, who had taken her position for the purpose of watching it) in a perfectly safe place, and he turned his eyes away from it in the discharge of a duty that he owed, perhaps, to a child that might have been, then, in the street, on the other side of the track, and, the next moment, he saw the plaintiffs’ child, in the street, approaching *1068 the track, she having reached, that position by reason of an impulse that was as unexpected to the motorman as to the mother and a movement that was as rapid as it was unexpected. It is extremely doubtful whether Casteix or any other motorman could have stopped the car in time to have averted the accident even if he had seen the child leave the sidewalk, as the mother says, “in a run,” since she ran at once in the direction of the approaching c.ar and of the track; but, having seen her in safety on the sidewalk, he had no more reason to anticipate her leaving there, as she did, than had the mother, and he was, therefore, no more guilty of negligence, in failing to see her leave, than he would have been had he failed to see another child leave the sidewalk, on the other side of the street, at the same moment. Upon the whole, the evidence leaves no room for doubt that he did all that the most competent motorman could have been expected to do to avert the accident, and, whether he would have done as much, under other circumstances, or by reason of his youth and alleged inexperience, he would have been unequal to an emergency by which he might have been confronted, is immaterial in this case. Inasmuch, however, as plaintiffs’ counsel argue that it was negligence per se for defendant to put a youth of 17 years (with the limited instruction and experience possessed by Casteix), in charge of its car, we will briefly consider that question.
There is nothing in the record, nor do we know of anything, to justify the conclusion that a man or youth, otherwise competent, should require more instruction and experience, in order to enable him to handle an electric street car, than can be obtained during four months of service as conductor and one month as motorman. It is true that defendant does not show the exact extent and character of the instruction given to Casteix while he was acting as conductor, and that might have been important had the accident occurred within a shorter period after he began to act as motorman. But he had been acting as motorman for a month when the accident happened, and, assuming that he possessed the other necessary qualifications, that experience ought, of itself, to have been sufficient, -without reference to his service as conductor. As to the other qualifications, a motorman should be cautious, alert, and physically capable. The required alertness and physical capacity are as likely to be possessed by a youth of 17 as by an older person. Caution, upon the other hand, is an attribute of age, and, though we will not undertake to say that all men of 21 are more cautious than all youths of 20, or even of 17, we are of opinion that, where, as in the position in question, caution is required, and human life depends upon its exercise, the employment of one who has not attained the age at which, by consensus of opinion, the judgment is sufficiently matured to enable him to assume the administration of his own affairs, is hazardous, and if disaster follows throws upon the employer an additional burden of proof. That burden the defendant in this case has discharged.
It is therefore adjudged and decreed that the verdict and judgment appealed from be annulled, avoided, and reversed, and that plaintiffs’ demand be rejected, and this suit dismissed at their cost, in both courts.