PROVO STY, J.
Plaintiff’s little boy, 6 years and 4 months old, who, plaintiff says, was 8 years old in size and 2 years old in sense, ran in front of one of the electric cars of the defendant company and was killed. Plaintiff contends that the motorman could have se.en the child in time to stop, but that he was looking to one side, instead of ahead. The car was going down Chippewa street, which is an unpaved narrow street with a single track in the center. The exact width of the street is not stated in the record; but in the photographs, which give a view straight down the street, the space between the car track and the gutter does not appear to be much wider than the car track. The collision occurred about 51 feet before the car reached Eighth street. It had stopped at Ninth street and taken on a passenger; and as it was to stop again for passengers at Eighth street it was coming down at only half speed.
The testimony of the motorman is, unsatisfactory in some respects. He says that before seeing the boy running towards his car he had seen a lady hailing him at the corner ahead, and had taken off his power and was winding his brake. He also says that when he saw the boy running towards his car he threw off his power and woiuid his brake, and that it was after this he noticed the lady at the corner ahead. He does not know whether the boy was running forward or backward, as the boy wore “one of these sun hats.” He should have seen a lady and a man at the corner ahead, as both were there. However, his having seen only the lady may possibly be accounted for by her having masked the man, which is made probable by the testimony of the lady, who says the man was looking down the street and saw the car only when, on her speaking to him, he turned to face her. On sharper questioning, the motorman became positive that he had noticed the lady before he had seen the boy running. As for the apparent contradiction with reference to the time when he took off his power and began winding up his brake, it may possibly be explained by supposing that on noticing the lady he threw off his power and began winding up his brake, and that practically at the same moment he saw the boy begin to run. In fact, that is what he testified to — that his seeing the lady and the boy “occurred at the same time.” The witness is evidently a slow-witted man, who becomes clear and positive only if given time. He produces the impression of an honest witness.
He says he saw the boy on the sidewalk to his left, and saw him suddenly start to-run across the street and in a direction slanting uptown or towards his car, without any *281 previous indication of Ms intention so to do, and so cióse to the car that he (witness') could see no more of him after he had left the sidewalk. While putting on his brake as quickly as he could, he halloaed to the boy. At that moment he heard somebody “hollering.”
A lady, seated on her doorsteps, 64 feet above the spot where the collision occurred, to the right of the motorman — -that is to say, on the opposite side of the street from that from which the boy was coming — had been looking down the street at the lady awaiting the car at the corner of Eighth. Her attention was attracted to the scene of the accident just as the car struck the boy. She, however, saw that he was “backing in front of the car.” She screamed. She says the motorman stopped the car “awful quick.”
Two men, Lynch and Leveson, were standing at the corner of Seventh, waiting for the car, both of them motormen of the defendant company, off duty. Both saw boy run from the side of the street in front of the car. One of them says the child ran “pretty close” in front of the car, and the other “couldn’t fix the distance.'”
The man standing at the corner of Eighth, whose name is Fabacher, says that the child was playing in the gutter and was seated on the street side of the gutter; does uot know how long he had been there; first noticed him when he rose suddenly and ran across. The car was then 10 or 15 feet away. The car was coming pretty fast. Car knocked the boy about 2 feet, several feet, and then it ran upon him again. The conductor was not looking. He applied the brake only after he struck the boy the first time.
This witness says that he was looking at the car from the time it left Ninth street, and that during this entire time the conductor was not looking ahead, but had his face turned to the left side of the street. In his statement of his having been looking at the conductor all this time he is contradicted by the lady who stood on the corner with him, Mrs. Nungesser, who says that he was facing downtown, or in other words, had his back towards the approaching car, and that he only turned and faced the car when she spoke to him. This lady contradicts the witness on another point. She says that on the day of the accident he was deaf, as the result of sickness; whereas, he says that his deafness on the trial had come upon him since the accident.
Another witness, Jobe, was seated on the steps of the drug store at the corner of Eighth, to the right of the motorman, about 50 feet from the spot of the collision. He was reading the paper. He heard some ladies screaming, and looking up saw the boy plunging forward, going probaioly 5 feet, when he disappeared under the car. Witness jumped up, and while getting up hollered to the conductor; but before he could yell the child was already under the car. The conductor was facing to his (the conductor’s) left, and had both hands on his brakes, and, when witness hollered to him, turned towards witness, and when witness cried out to him, “You’ve got a boy under the car!” he started to put on his brake and to take off the power.
Another witness, Modenback, was standing in the door on the steps of which the last witness, Jobe, was seated. On hearing Jobe cry out to the motorman, “You .have got a boy!” he looked in the direction of the car, and saw that “the car had struck the boy and pushed him forward, and then the car came up again on him the second time and went over him.”
On cross-examination he said:
“It was about to hit the child. The child and car was together, and the child was going like this, because it has knocked him about eight feet. His head was going forward, and then he made a somersault.”
*283 I-Ie says that at the moment he looked the motorman—
“had his hand on the brake and his face was turned to his left. He was not looking towards the front of the car at all. lie did not know of the child until I hollered at him.”
This last witness says that, when the car stopped, the motorman got off, looked underneath the car, and said, “My God, sport! I did not know I had the hoy,” and went on walking to Eighth street.
Jobe, the witness who had been sitting on the doorsteps reading the paper, says of the motorman:
“He came back to where the child was, and he said: ‘Well, it was not my fault, sport. I didn’t know I had the child.’ ”
Fabacher, the deaf witness who stood at the corner with Mrs. Nungesser, says:
“He got off the car, and came back there, and said he didn’t know he had hit anybody at all.”
Mrs. Weber says:
“I heard a terrific scream, and I got up and went right through the hall, when I heard the car stop with a terrible jolt. I thought it had struck something, because it gave such a terrible bump. Just as I came around the car the motorman stepped down with the handle bar in his hand. He said: ‘It wasn’t my fault, because I didn’t see the child.’ ”
The motorman says that the witness Lynch told him not to get off the car and that he did not do it until the policeman came; and he denies having said what Johe, Modenback, Fabacher, and Mrs. Weber say he said. Timpe, a passenger on the car, says he was near the motorman all the time, and did not hear him make the remarks in question; only heard him say he could not help it. Lynch, who was at the corner of Seventh street, says he ran to the car, and when he got there the motorman was on the back platform, and he told him to remain there.
The sole, negligence charged against the defendant company is the inattention of the motorman — his not having been looking-ahead at the time the child came upon the track.
The only witnesses who pretend to have seen the child go upon the track are the motorman, Fabacher, who was at the corner of Eighth street waiting for the car, and Lynch and Leveson, who were together at Seventh, also waiting for the car. The motorman says that when the child ran upon the track the car was so near that the child could no longer be seen by him after it had crossed the gutter. Fabacher says the car was 10 to 15 feet away. Lynch says “very close to the car.” Leveson could not undertake to specify any distance. The car was running at half speed. Lynch, an experienced motorman, testifies that with the car going at half speed the safest and the quickest way to stop is not by using the reverse, but by using the brake, and that a stop in 30 or 40 feet would be a good stop. Lais, defendant’s chief instructor of motormen, says that with the car at half speed the use of the brake is the quickest and most effective way of stopping the ear, and that a stop in 35 to 50 feet would be a good stop. O’Brien, defendant’s superintendent of equipment, says that a stop in 35 to 50 feet would be a good stop. According to this evidence, the accident was inevitable, no matter how attentive the motorman might have been.
The motorman testifies that by means of the reverse a stop from half speed can be made within 10 to 15 feet; but he admits that he has never tried to make such a stop, and that, therefore, he knows nothing- about it.
The car made a good stop. According to our computation it stopped within 4G feet. Timpe, a passenger, says the car could not have been going very fast, “or he couldn’t have stopped the way he did.” Mrs. Diest, the lady sitting on her doorsteps, says: “He stopped the car awful quick.” Mrs. Weber, the lady who ran out of her house: “Heard, *285 the car stop with a terrible jolt. It gave a terrible bump.”
The reasons for judgment of the learned judge a quo are not in the record; but, doubtless, the witnesses Jobe and Modenback impressed him, as they do us, unfavorably.
Evidently, the harrowing scene of the accident has wrought upon them, and they are straining matters to create a responsibility on the part of the defendant company. If the motorman had begun to put on his brake when they say he did, he could never have made the stop that he did. Again, they saw entirely too much at one glance. Fabaeher, too, is pulling hard at the situation when he makes the motorman keep his eyes to the left and not look forward once during the entire time from the stop at Ninth to the moment of the accident. It'is hard for us to believe this, especially if we believe Mrs. Nungesser when she says that he had his back to the approaching car and was looking downtown.
The motorman says, on the witness stand, that he did not know he had run over the child until after he got down and saw the child under the car. What he means by this is that until then he did not know for certain but that the child might have escaped. To attribute to his words the meaning that he did not until then know that the child had run towards the car would be to involve him in a contradiction that no intelligent man would fall into; and the witness was not lacking in intelligence though of the slow-moving kind. We have no doubt at all that Jobe, Modenback, Fabaeher, and Mrs. Weber heard this motorman make some remarks of that kind, and that they construed it iDto an admission that he had not seen the child run towards the car. They differ in the words which they attribute to the motorman. Admissions are notoriously a most dangerous kind of evidence, and all the more so when the witness at the time he pretends to have heard them was laboring under great excitement.
The boy is not shown not to have been as active as the average well-grown boy of his age. He had come to the place of the accident a little while before “on the back of an ice wagon.” If he traversed the narrow space between the sidewalk and the track at a run, the time it took him to do it must have been so very brief as to have been approximately instantaneous, and certainly not sufficient to allow ,of the stopping of the car. We think the case is analogous to those
of Campbell v. Railroad Co., 104 La. 183, 28 South. 985; Miller v. Railroad Co., 114 La. 409, 38 South. 401; Cloud v. Alexandria R. R. Co., 121 La. 1065, 46 South. 1017, 18 L. R. A. (N. S.) 371. Judgment Affirmed.