No. 14,132.

STATE OF LOUISIANA vs. HORTER J. PERIOUX.

### SYLLABUS.

1. A man, called as a juryman, answered, on his *voir dire,* to counsel for defense, he thought the man who committed the homicidal deed ought to be punished and that as soon as he heard of the case he formed that opinion. Challenged for cause, he was questioned by the court and answered he had no prejudice

State vs. Perioux.

against the accused; as a juror, would decide the case according to the evidence as given by the witnesses and the law as expounded by the court; no outside impression or opinion would influence him in his verdict. *Held*, competent as a juror.

2. The mere expression by a citizen of a just indignation on hearing of the death by violence of another, does not disqualify him from jury service in the case.

3. It is objectionable for the defense to ask of jurors, on their *voir dire*, questions like the following:—"In a criminal prosecution, as a juror sworn to try a case and when forming your verdict, to whom would you give the benefit of the doubt—the State or the accused?" "If accepted on this jury would you give the benefit of any doubt created in your mind by the evidence to the accused and acquit him?" "Would that doubt have to be a very great one, or a reasonable one?"

4. It is for the trial Judge, at the end of the trial, to charge the jury relative to the law of "reasonable doubt," and it is not to be supposed in advance jurors will decline to heed the charge so to be given, or will refuse to be instructed by the court.

5. But in order to test the *animus* of a juror towards the accused, it may be permissible for the defense, *first explaining or having the Judge explain* the meaning of "reasonable doubt," its application to the case, and his duty to acquit should it exist, to ask the juror whether he would give the accused the benefit of such doubt.

6. Evidence of threats made by the deceased a short time prior to the killing is not admissible until foundation therefor is laid by proof of an overt act showing purpose to execute the threats.

7. It is the province of the trial Judge to decide whether the evidence submitted *pro* and *con* of overt act makes sufficient proof thereof to lay the foundation for the admission of testimony as to antecedent threats.

8. While his ruling in this regard is subject to review here, great reliance is placed upon his discretion and judgment in such matters—he having seen and heard the witnesses.

9. If evidence of a previous threat be not admissible because not accompanied then or afterwards by an overt, hostile act, it follows, logically, the statements constituting such threat cannot be admitted in evidence as part of the *res gestae.*

10. If other witnesses than the accused could not legally testify to alleged antecedent threats because no foundation therefor had been laid by proof of overt act, neither may the accused, himself, do so, when called to the stand as a witness in his own behalf.

11. If the accused may not give such testimony under oath on the stand as a witness in his own behalf, neither is he permitted to do so when tendered by his counsel to make before the jury an unsworn statement in his capacity *as the accused on trial.*

12. Jurors are not competent as witnesses to impeach their verdict. A court must draw its knowledge of the misconduct of jurors from some other source.

APPEAL from the Nineteenth Judicial District, Parish of St. Martin—*Foster, J.*

*Walter Guion,* Attorney General, and *Anthony N. Muller,* District Attorney (*Lewis Guion,* of counsel), for Plaintiff, Appellee.

*Mouton & Simon* and *Broussard, Dulany & Broussard,* for Defendant, Appellant.

The opinion of the court was delivered by

BLANCHARD, J. Defendant was indicted for the murder of Gabriel Bulliard, found guilty of manslaughter and sentenced to five years at hard labor. He appeals.

Various objections are presented in support of his contention that he was not tried and convicted according to law.

Bergeron, a juror, on his *voir dire* stated, in reply to questions by counsel for defendant, he thought the man who killed Buillard ought to be punished, and that as soon as he heard of the case he formed the opinion the man who slew him ought to be punished.

He was challenged for cause by defendant. Whereupon the trial judge propounded questions to him, with the result that he replied that he had no prejudice against the accused; that as a juror he would decide the case according to the evidence as given by the witnesses on the stand and the law as expounded by the court; that no outside impression or opinion would influence him in his verdict; that he had talked to no one about the case and no one had talked to him about it; and that he had not formed or expressed any opinion as to the innocence or guilt of the accused.

It is well settled that the man who makes such answers to the court is competent to sit on the case as to which he, is called as a juror. State vs. Kellogg, 104 La. 581. The mere expression by a citizen of a just indignation on hearing of the death by violence of another does not disqualify him from jury service in the case.

It is objectionable for the defense to ask of jurors, sworn on their *voir dire,* questions like the following:

"In a criminal prosecution, as a juror, sworn to try a case and when forming your verdict, to whom would you give the benefit of the doubt —the State or the accused?"

"If accepted on this jury, would you give the benefit of any doubt created in your mind by the evidence to the accused and acquit him?"

"Would that doubt have to be a very great one, or a reasonable one?"

The law requires the trial judge, at the end of the trial, to charge the jury that if a reasonable doubt find lodgment in their minds as to the guilt of the accused, they must give the latter the benefit of the same

and acquit, and it is not to be supposed, in advance, that the jury will decline to heed the charge so to be given, or that a juror will refuse to be instructed by the court.

In order to test the *animus* of a juror towards an accused person, it might, perhaps, be permissible for counsel for the defense, first, explaining, or having the judge explain, the meaning of "reasonable doubt," its application to the case, and his duty to acquit in case of the existence of such doubt as to guilt, to ask the juror whether he would give the accused the benefit of such doubt should it arise in his mind. But to permit him, without explanation of the meaning of "reasonable doubt," and without instruction as to his duty as a juror in respect to the same, to be asked the questions, or any one of them, noted above, would be improper, as tending to confuse and embarrass.

Another bill of exceptions presents the protest of the accused against the ruling of the judge declining to receive evidence relative to threats alleged to have been uttered by the deceased against the accused.

It appears the accused and the man he killed were rival merchants, keeping country stores. Bayou Teche separated their stores, but it had been bridged at that point. The store of the accused was at the eastern end of the bridge; that of the dead man at the western end.

The day of the homicide was Sunday. It seems that the law against opening stores on the Sabboth is enforced in that parish. The accused went to his store on that Sunday morning and opened it—not, it appears, for the purpose of selling goods, but for another purpose.

Buillard (the man killed), from his side of the bayou, saw defendant open his store and thereupon rode over the bridge on horseback up to the door of the store and inquired about the opening of the store, objecting to the same.

A wordy dispute followed, the parties became angry, vile language was used, the contention of the accused being that there and then threats were made by Buillard to the effect that when he (the accused) would, later, cross the bayou there would be another and hostile meeting between them.

Buillard then rode back to his premises across the bridge. The house of the accused appears to have been on the same side of the bayou, and in reaching it he had to cross the bridge and go past the house of Buillard.

A half hour after the conversation between the parties at the store,

the accused crossed the bridge, having first armed himself with a pistol. There is evidence to the effect that on reaching a point in the road opposite the house of Buillard he called to the latter and invited him out to the road. There is other evidence to the effect that he did not accost Buillard and invite him to the road, but that the latter, seeing the accused coming up the road, came out to the road, crossed the fence that separated his yard from the road, and got into the road ahead of the accused and between the latter and his home.

It seems that Buillard had, too, armed himself with a pistol and both parties had their weapons in hand as they confronted each other in the road.

Some words passed between them, whereupon the wife of Buillard, who had, with their son, followed her husband, begged the parties not to fight until they could get witnesses and to put off a combat until the following day, Monday—her hope being, it is said, that by that time the parties would think better of it and no fight would ensue.

She followed this up by calling to her husband to come back into the yard. He obeyed, left the road, recrossed the fence and entered the yard.

When in the yard he was fired at three times by the accused, one of the shots striking him in the *rear* of the right side, the bullet entering about three inches from the spinal column, passing straight through the stomach and making its exit towards the *front* of the left side.

The contention of the accused is that Buillard on regaining the yard, again faced him, leveled his pistol and was about to fire, when he (the accused), himself, fired.

There is testimony to support this view.

The contention of the prosecution, supported by evidence, is that this is not so, that Buillard had renounced the combat in the road, had heeded the request of his wife to return to the yard, had started for his house, and was in the act of restoring his pistol to its pocket when he was shot practically in the back.

On offering the testimony to prove threats uttered at the store a half hour before the fatal shot was fired, the contention of the accused is that Buillard, after leaving the store, went home and armed himself, waited until the accused had crossed the bridge and was upon the public road on his way home, and then intercepted him in the road with the intention and purpose of carrying the threat into execution.

The prosecution opposed the reception of the evidence on the ground

that before testimony of previous threats can be elicited, it is necessary to lay a foundation therefor by showing an overt, hostile act or demonstration on part of the deceased, at the time of the homicide, exhibiting a purpose on his part to carry the threat into execution; that previous threats will not justify the taking of human life unless there is a present intent evidenced by some overt act to execute them.

Following this objection, the court, at the request of the defense, received testimony in support of the alleged overt act, first retiring the jury.

From the testimony thus taken, the brief statement of facts heretofore given is abstracted. The evidence came up as part of the bill of exceptions.

The trial judge sustained the objection to the testimony and it was excluded.

We cannot say he erred. Whatever may have been said by Buillard at the store a half hour previous to his being shot, and whether he went out to the road of his own motion, or was invited out by the accused, and whether in going out of his own motion, or on the invitation of the accused, he had the then purpose of executing a previous threat uttered, it is evident that once in the road and facing his antagonist he thought better of it and did not shoot or attempt to shoot, but heeded the request or call of his wife and re-entered the yard, and after he was in the yard and while his back was still towards the accused, was shot. The place of entry of the ball is indubitable proof that he was shot from behind. Under the circumstances, it is impossible to conclude he was, at the moment, facing the accused and about to shoot at him.

The trial Judge, who heard the witnesses, came to the conclusion whatever overt act there may have been at one time, if any, had been abandoned, the deceased had renounced any purpose of assaulting the accused, had retired from the combat and was on his way home when the accused, himself, became the aggressor and shot and killed him. Kellogg's Case, 104 La. 192, et seq.

There being a wide difference between *evidence* of an overt act and *proof* of the same, it was for the Judge to decide, from the evidence offered in support of the overt act, whether a sufficient foundation had been laid for the admission of the testimony offered to prove previous threats. If the foundation had been laid, he must admit it; if not laid, he was justified in not admitting it. *Ib.* 597-599; State vs. Nash & Barnett, 46 La. Ann. 208; State vs. Harris, 45 La. Ann. 842; State vs. Ford, 37 La. Ann. 443; State vs. Frierson, 51 La. Ann. 706.

We are not prepared to say he erred in his judgment, on the evidence adduced, that it had not been laid.

Having failed to obtain the admission of testimony of previous threats made by the deceased as distinct substantive evidence, the defense offered the same or similar testimony, claiming its admissibility as part of the *res gestae*. On objection by the State it was excluded and a bill reserved.

This bill shows that while Sonnier, a witness for the defense, was testifying he was asked concerning the conversation had between Buillard and the accused at the store of the latter a half hour before the shooting of Buillard, and, especially, as to the statements then and there made by the latter to the accused, for the purpose, as announced by defendant's counsel, of establishing that the same were and formed part and parcel of the same transaction or difficulty which ended in the death of Buillard—this with the view of securing the admission of the testimony as *res gestae*.

Was it such? We hold with the trial Judge it was not. The use of rough and violent language between the parties at the store, the bandying of epithets, the declaration of Buillard, in effect, that when the accused crossed over to his side of the bayou he would meet him there and have it out with him, was not, as we have seen, followed by an overt act on part of Buillard in execution of the threat. If it had, the testimony would have been admissible on the grounds set up in the bill of exceptions we have just considered.

If the evidence were not admissible as showing a threat, because not accompanied then or afterwards by an overt act, it follows, logically, that it cannot be considered part of the *res gestae*.

Threats, unaccompanied by an overt, hostile act, do not warrant the taking of human life. If, therefore, the accused, a half hour after the threat was uttered, crossed over the bayou, found Buillard and killed him, it would be stretching the doctrine of *res gestae* very far to say that what had occurred at the store of the accused came within its grasp. It would be practically holding that the accused had the right to kill Buillard because of the threat, notwithstanding there was no further aggression or hostile act on his part.

That which is thus sought to be admitted as *res gestae* is to be viewed, rather, as something pertaining to a different and disconnected occasion or transaction.

In other words, the wordy dispute across the bayou is to be

considered another affair from the shooting which, a half hour later, resulted in the death of Buillard, and, therefore, not a part of the *res gestae*—not a thing, or act, or circumstance connected with his violent death at the hands of the accused.

The distinguishing characteristic of these things which constitute *res gestae* is that° they must be necessary incidents of the criminal act, or immediate concomitants of it.   Wharton Crim. Ev., Sec. 263.

We do not think the excited utterances of Buillard across the bayou stand in immediate causal relation to the subsequent act of the accused in killing him, and, hence, they are not to be considered as part of the action immediately producing the homicidal deed.   *Ib.*

It has been held that no flexible rule can be formulated in determining what constitutes *res gestae;* that the facts of each case stand alone and must speak for themselves; that in each case the particular facts and incidents must be considered as an independent group, and the judge must determine whether they fall within or without the operation of the rule.   Molisse's Case, 38 La. Ann. 383.

Conceding that Buillard had not come out into the road on the invitation of the accused, but was there of his own motion, intercepting the accused in furtherance of a purpose to do him bodily harm, yet when he desisted from that purpose, renounced the combat, retired from the scene, crossed back over the fence into his yard, he broke the connection between the threat he had earlier made at the store across the bayou and the shot of the accused which killed him.   *Res gestae* consist of circumstances or declarations made admissible as original evidence by reason of their connection with the particular act under investigation, and the test is whether the fact or declaration sought to be put in evidence is so connected with the act charged against the accused as to form, in conjunction with it, one continuous transaction.   1 Greenleaf (14th ed.), Sec. 108, p. 161;   Donelon's Case, 45 La. Ann. 745;   Wilson's Case, 43 La. Ann. 841.

Having failed to secure the admission of evidence relative to antecedent threats of the deceased on the two grounds just considered, to-wit:—that of overt act following the threat, and that of *res gestae,* the accused, himself, took the stand as a witnes in his own behalf and sought to testify to such threat.

Being met with the same objection that had resulted in excluding such evidence by other witnesses on the grounds referred to, his counsel took the position that the accused as a witness for himself was not to be

restricted by the ordinary rules of evidence which govern other witnesses, and, hence, while other witnesses might not testify to threats made without foundation for the same having been laid the accused could.

Being overruled as to this contention, a bill was reserved. We find no error here.

The accused was then withdrawn by his counsel from the stand *as a witness* and tendered to make an unsworn declaration *as an accused* to the jury. The declaration he would have made was as to threats against him by the deceased—the same previously ruled out.

Objection to this by the State was sustained and a bill reserved.

In support of his right to make such a declaration, we are referred to Art. 9 of the Constitution of 1898. We find nothing in this article authorizing the same.

Then follow three bills of exception embodying objections to the ruling of the judge refusing a new trial. The grounds set forth in the motion for new trial relate to alleged misconduct of the jury during their deliberations in this, to-wit:—that certain books relating to Crimes and Criminal Law having been left on the table used by the attorneys in the court-room, and the jury having had access to this room when the court was sitting, some of the jurors examined these books and read portions of them.

It was proposed to prove this by the testimony of two of the jurors, themselves, who were offered for the purpsoe.

The State objected and the objection was sustained on the ground that a court must derive its knowledge of the misconduct of jurors from some other source than the jurors themselves.

This ruling was correct. State vs. Nelson, 32 La. Ann. 847.

For the reasons assigned it is ordered, adjudged and decreed that the verdict, sentence and judgment appealed from be affirmed.

Rehearing refused.

(Mr. Justice MONROE dissents, being of the opinion that under the Constitution (Article 179), where, in a case such as this, there is *any* evidence tending to show the overt act relied on as the foundation for the introduction of evidence of previous threats, a question of fact bearing upon the " guilt or innocence " of the accused is presented, which should be submitted to the jury and which includes the question as to whether the previous threats were made.)