(65 South. 600)

No. 20646.

STATE v. McCOLLUM et al.

(June 8, 1914.)

*(Syllabus by the Court.)*

1. CRIMINAL LAW (§ 1166½*) — DISCRETIONARY RULING—COMPETENCY OF JUROR.

The trial judge is given so much discretion by section 1 of the Act No. 135 of 1898 to decide upon the competency of a juror to serve in any particular case that his rulings will not be disturbed unless it is shown that the defendant was compelled to accept an objectionable juror.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3114–3123; Dec. Dig. § 1166½.*]

2. CRIMINAL LAW (§ 671*) — WITNESSES (§ 269*) — CROSS-EXAMINATION — PRESENTATION FOR REVIEW.

The defendant has no right to cross-examine a state witness upon irrelevant and immaterial matter not referred to by the witness in his examination in chief. When such an objection is sustained, the cross-examination should be had and reduced to writing out of the presence of the jury to enable this court to review it and decide whether it was properly excluded.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1591, 1592; Dec. Dig. § 671;* Witnesses, Cent. Dig. §§ 949–954; Dec. Dig. § 269.*]

3. HOMICIDE (§§ 203, 205*)—DYING DECLARATIONS—ADMISSIBILITY.

Whether a wounded man's statement is admissible in evidence as a dying declaration is to be determined by the circumstances in each case. There is no rule requiring that his statement that he fears he is about to die must be made at the same time when he makes the dying

declaration, to render the latter admissible as such.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. §§ 430–437, 443; Dec. Dig. §§ 203, 205.*]

4. CRIMINAL LAW (§ 338*)—EVIDENCE—CONVERSATION.

Since the defendant in a criminal case is a competent witness in his own behalf, a state witness, who has heard only a part of a conversation between the accused party and a third party, should be permitted to relate the portion of the conversation which he heard, and leave it to the defendant to prove the balance of the conversation. The testimony of the state witness should not be excluded upon the ground that he did not hear all of the conversation.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 752, 753, 755, 756, 787, 788, 801, 855; Dec. Dig. § 338.*]

5. CRIMINAL LAW (§ 656*) — REMARKS OF COURT—COMMENT ON EVIDENCE.

When the defendant's attorney persists in arguing upon facts which were excluded from the evidence, in violation of the ruling of the trial judge and over the objections of the district attorney, it is not a comment upon the evidence for the judge to say: "I have already ruled that counsel is out of the record." This is no more a comment upon the facts than was the ruling made in the presence of the jury, excluding the evidence.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1524–1533; Dec. Dig. § 656.*]

6. HOMICIDE (§§ 18, 62*)—ELEMENTS OF CRIME —CONSPIRACY TO KILL.

As the intention to take human life is not an essential element in the crime of murder or manslaughter, all of the parties to a conspiracy are guilty of murder if a homicide be committed in carrying out a conspiracy to commit any felony, and all of the conspirators are guilty of manslaughter if a felonious homicide be committed in carrying out a conspiracy to commit a less serious offense, not naturally tending to the destruction of human life.

[Ed. Note.—For other cases, see Homicide, Cent. Dig. §§ 24–31, 85; Dec. Dig. §§ 18, 62.*]

7. CRIMINAL LAW (§ 1156*)—APPEAL—DISCRETIONARY RULING—DENIAL OF NEW TRIAL.

A motion for a new trial, based upon the alleged misconduct of the jury, is addressed to the discretion of the trial judge to such an extent that his refusal to set aside the verdict will be affirmed, unless manifest error and probable injury are shown.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3067–3071; Dec. Dig. § 1156.*]

Appeal from Fifth Judicial District Court, Parish of Winn; Cas Moss, Judge.

Clarence McCollum and another were convicted of manslaughter, and appeal. Affirmed.

Grisham & Oglesby, of Winnfield, for appellants. R. G. Pleasant, Atty. Gen., Julius T. Long, Dist. Atty., of Winnfield, J. R. Hunter, of Alexandria, Allan Sholars, of Monroe, and Earl E. Kidd, of Winnfield (G. A. Goudran, of New Orleans, of counsel), for the State.

O'NIELL, J. The defendants were indicted and tried for murder, were convicted of manslaughter, and sentenced to imprisonment in the state penitentiary for the term of 20 years. From this verdict and sentence they have appealed and present 18 bills of exception for our consideration. The first of these bills is marked A, and the others are numbered from 1 to 17, inclusive.

Bill of exceptions A was reserved to the judge's overruling the defendants' objections to being arraigned on the 14th of April, 1914. The objections urged were that the district court was then in session in Jackson parish in the same district, and that an election was then being held in the parish of Winn, making the day a legal holiday.

The record shows that the defendants were called for arraignment on the 11th of April, 1914, and, on objection of their counsel, the district court in and for the parish of Winn adjourned over from the 11th to hold session in this parish on the 14th of April, 1914.

A primary election was held on the 14th of April, 1914, in the Eighth ward of the parish of Winn, to nominate a candidate for member of the police jury from that ward. The district courthouse is not in the Eighth ward of Winn parish. Under the Act No. 3 of 1904, amending section 1114, R. S., a general parochial or municipal election day is a legal holiday only within the locality in which such an election is held. This bill of exceptions, however, is disposed of by the fact, as

shown by the record, that the arraignment of date the 14th of April was set aside on the 20th of April, 1914, and the defendants were then rearraigned and entered their plea of not guilty.

[1] Bills of exception numbered 1, 2, and 3 were reserved to the rulings of the judge in sustaining or disallowing peremptory challenges in the selection of the jury. These bills are not seriously urged; and the facts therein disclosed show that the rulings were all within the discretion vested in the trial judge by section 1 of the Act No. 135 of 1898, which provides:

"That the judges of the district courts shall have discretion to decide upon the competency of jurors in particular cases where from physical infirmity or from relationship * * * or other causes, the person may be, in the opinion of the judge, incompetent to sit upon the trial of any particular case."

Bills of exception Nos. 4 and 5, which were reserved to the drawing of additional jurors before the regular venire was exhausted, have been abandoned in this court and need not be considered.

[2] Bills of exception Nos. 6, 7, and 8, as counsel for defendants say in their brief, "can all three be considered together." They were all reserved to the rulings of the judge excluding testimony sought to be elicited on cross-examination of the state's witness Mrs. Bernice Sholars, the widow of the victim of this tragedy. The testimony was reduced to writing out of the presence of the jury, and, after a careful reading of it, we find no error in the court's rulings.

The testimony annexed to the bill No. 6 shows that, some months before the killing, the defendant McCollum hauled the trunk and other effects of Mr. Sholars to and from the railroad station or switch. It does not appear that the witness had been examined upon this subject in the direct examination, and we cannot see how this evidence could have been material. The only purpose stated was to show the reason for Clarence McCollum's being at the house of Albert Sholars on the morning when the latter was killed. We agree with the statement of the district judge that this evidence could not have served the purpose for which it was offered.

The testimony annexed to bill No. 7 is that the witness Mrs. Bernice Sholars had a quarrel with her husband at their home on the night before he was killed; that she left home on account of the quarrel, spent the early part of the night at her father's house, and went to the home of the defendant Will Hudgens at about midnight, and remained there, talking to Mr. and Mrs. Hudgens about the quarrel with her husband, until 7 o'clock next morning, when she returned to her home and husband. The avowed purpose of this testimony was: (1) To show why the defendant Will Hudgens went to the home of Albert Sholars on the morning on which the latter was killed; (2) to affect the credibility of the witness Mrs. Sholars; and (3) to show the frame of mind of Albert Sholars at the time and immediately before the killing. We agree with the statement of the trial judge that the evidence would not have served any of the purposes for which it was offered.

The testimony annexed to the bill of exceptions No. 8 is to the effect that the witness Mrs. Sholars was seen holding a conversation with a man named Bill Clark in the road near her home on the evening before the killing, and that this was the cause of the quarrel between Mr. and Mrs. Sholars that night. The witness was asked whether her husband had threatened, during the quarrel, to kill some of the men who had been running after her. Her answers were that he had not made any such threat. This testimony was also offered to show the state of mind of Mr. Sholars, to show who was the aggressor in the fatal difficulty next morning, and to discredit the witness Mrs. Sholars. We agree with the judge's statement that the testimony could not have

served any of the purposes for which it was offered. The proof was that Mr. Sholars was killed at his own residence at about 10:30 o'clock in the morning. There was no unfriendly feeling between the accused and Mr. Sholars up to the time of the fatal difficulty. The quarrel between Mr. and Mrs. Sholars was at an end, and she was seated on his knee on their porch when the two defendants came to the house and provoked the difficulty.

[3] Bill of exceptions No. 9 was reserved to the judge's ruling, permitting the state's witness Mrs. John Halbrook to relate to the jury the dying declaration of Albert Sholars that Will Hudgens fired the last shot and the one that killed him. The objection was that it had not been proven that Mr. Sholars realized that he was about to die when he made the declaration that Will Hudgens fired the last and fatal shot. The testimony annexed to this bill shows that Mrs. Halbrook arrived at the Sholars home soon after the shooting. Mr. Sholars lived only about two hours after he was shot. About an hour and a half before he died, he said to Mrs. Sholars, "I am paralyzed from my waist down." He was then lying in his bed, and they were anxiously waiting for the doctor. Some one said to Mr. Sholars, "I don't think you are shot much;" and he replied, "Yes, I am; I am shot through and through, and I won't live long. If the doctor doesn't come pretty soon it will be too late." After these statements were made, Mrs. Halbrook went over to her home, and when she returned Mr. Sholars made the dying declaration that Will Hudgens fired the last and fatal shot. The argument of the defendants' counsel is that Mr. Sholars' belief that he was about to die might have changed into a hope of recovery during the time it required for Mrs. Halbrook to go to her home and return. This does not seem reasonable under the circumstances. Mrs. Sholars also testified, without objection, that her husband knew he was about to die when he said that Will Hudgens was the man who shot him fatally after he had fallen. Our conclusion is that a sufficient showing was made to admit the statement of the wounded man as a dying declaration.

[4] Bill of exceptions No. 10 was reserved to the ruling of the judge, permitting the state's witness Albert Stephens to testify that he passed by Will Clark and the defendant Will Hudgens between 9 and 10 o'clock on the morning of the killing, and "heard Mr. Clark say that Will had been with the party all the morning and didn't think that he was going to do anything." The objection urged to this testimony was that the witness had not heard all of the conversation between Clark and Hudgens.

Passing upon a somewhat similar question in the case of State v. Spillers, 105 La. 163, 29 South. 480, this court said:

"The objection urged by defendant's counsel was that the witness was not able to repeat the entire conversation, and that it was not competent for the court to admit an isolated phrase or part of conversation; that the accused was entitled to have the whole of it, or to have the whole of it excluded from the jury. In answer to a similar objection, this court said: 'If more was uttered on the same subject, it was the duty of defendant's counsel to have introduced those other persons and proved that fact, and not left it open to inference.' State v. Oliver, 43 La. Ann. 1003, 10 South. 201. Besides, the testimony was admissible, although the witness did not hear the whole conversation."

Bill of exceptions No. 11 was reserved to the ruling, excluding the cross-examination of the state witness J. M. Jordan, father of Mrs. Sholars, upon the subject of her visit to his house the night before her husband was killed. The testimony was taken down, and it is only to the effect that Mrs. Sholars visited her father's house and told him of the quarrel between her and her husband. Her father "jacked her up," as he says, for talking to Bill Clark in the woods, and she became angry and left her father's house, saying she was going home.

This bill of exceptions is similar to the bills Nos. 6, 7, and 8. The subject had not been mentioned in the direct examination of this witness, and the evidence was irrelevant and was properly excluded.

[5] Bill of exceptions No. 12 was reserved to a remark made by the trial judge in the presence of the jury. It was objected to as a comment upon the facts of the case. The judge's statement annexed to this bill recites that one of the attorneys, in his argument to the jury, said that the wife of the deceased stayed out all night in the woods with two men the night before the killing. This was objected to by the district attorney, because no such evidence had been admitted on the trial. Thereupon the judge instructed the defendants' attorney to confine his argument to the record. The attorney continued with the same objectionable line of argument; the district attorney again objected; and the judge then said, "I have already held that counsel is out of the record."

This remark was not a comment upon the facts of the case, no more so than the ruling which had been made in the presence of the jury, excluding the irrelevant evidence.

[6] Bill of exceptions No. 13 was reserved to the refusal of the trial judge to give the following special charge, which was presented and requested after the judge had charged the jury and when they were about to retire, viz.:

"If you should find from the evidence that the difficulty arose in an exchange of shots between the deceased and the defendant Clarence McCollum, and that the defendant Clarence McCollum ceased shooting and left the building without killing the deceased or causing an injury that contributed to his death, and that thereafter the defendant Will Hudgens returned to the building and fired the fatal shot, this shot being fired after the defendant Clarence McCollum had abandoned the difficulty and left the house, in such case it will be your duty to acquit the defendant Clarence McCollum, unless the evidence convinces you, beyond a reasonable doubt, that the fatal shot was fired and killing done in carrying out an agreement between the two defendants to kill the said deceased."

The judge declined to give this special charge because the subject was covered by his general charge, and particularly by that portion complained of in the bill of exceptions No. 14. The special charge requested was properly refused, not only because it had been given correctly in the general charge, but because it was not a correct statement of the law of homicide committed in carrying out a conspiracy to do an unlawful act. It was not required that "the killing should have been done in carrying out an agreement between the two defendants to kill the deceased," to make them both guilty of murder. They were both guilty of murder if the killing was done in their carrying out a conspiracy to commit any felony, and they were both guilty of manslaughter if the killing was done in their carrying out a conspiracy to commit a less serious offense, not naturally tending to destroy life. See Wharton on Homicide, pars. 436, 439, 440.

The portion of the general charge given by the district judge which was complained of in the bill of exceptions No. 14 is as follows:

"If you should find from the evidence that the difficulty arose in an exchange of shots between the deceased and the defendant Clarence McCollum, and that the defendant Clarence McCollum ceased shooting and left the building without killing the deceased or causing an injury that contributed to his death, and in this manner abandoned the difficulty and let the fact be known to deceased that he desired to abandon the difficulty and had actually abandoned it, and that thereafter the defendant Will Hudgens returned to the building and fired the fatal shot, this fatal shot being fired after the defendant Clarence McCollum had abandoned the difficulty and left the house, in such case it will be your duty to acquit the defendant Clarence McCollum."

In one respect this charge is more favorable to the defendant Clarence McCollum than the special charge requested by him, for the jury was instructed that, if McCollum abandoned the difficulty before Will Hudgens fired the fatal shot, McCollum was entitled

to an acquittal, without regard to the law of conspiracy.

The complaint urged was that the judge put too great a burden upon McCollum in requiring that he should "let the fact be known to the deceased" that he was abandoning the difficulty. A reasonable understanding of this charge was that if McCollum ceased shooting and left the building before Hudgens fired the fatal shot, and if McCollum let it be known by retreating and ceasing the firing that he had abandoned the difficulty, he should be acquitted. And in that sense the charge did no injustice to the defendant McCollum. This charge did not reasonably mean or imply that McCollum was required to do anything more than to cease firing and leave the house, in order to let Albert Sholars know that he had abandoned the difficulty. It must be borne in mind that this was only a portion of the general charge, which, when taken as a whole, did no injustice to either of the defendants. For example, referring to Clarence McCollum, the judge gave this further instruction:

"If, on the other hand, the evidence fails to convince you beyond a reasonable doubt that the accused did the killing, or was present, aiding, abetting, or assisting the one who did the killing, even though the evidence may establish the commission of a homicide, it would be your duty to give the accused the benefit of the doubt and acquit him."

Bill of Exceptions No. 15 was reserved to an extensive part of the judge's charge. This bill is not referred to in the brief of the defendant's counsel, and we conclude that the intention was to abandon it. The only objection was that that portion of the charge does not state the law correctly. The counsel failed, however, to point out any error, and we fail to find any. Such an objection is entirely too general and sweeping to enable us to find any error in the charge, which must be taken as a whole. State v. Weston, 107 La. 45, 31 South. 383; State v. Melton, 37 La. Ann. 77; State v. Nicholls, 50 La. Ann. 699, 23 South. 980; State v. Allen, 111 La. 158, 35 South. 495.

Bill of exceptions No. 16 was reserved to the judge's failure to name all of the verdicts which the jury might render. The written charge shows that the judge instructed the jury that they might render any one of the following verdicts, viz.:

(1) We, the jury, find the accused guilty as charged.

(2) We, the jury, find the accused guilty without capital punishment.

(3) We, the jury, find the accused guilty of manslaughter.

(4) We, the jury, find the accused not guilty.

(5) We, the jury, find the accused (giving his name) guilty as charged, and the other accused not guilty.

(6) We, the jury, find the accused (giving his name) guilty without capital punishment, and the other accused not guilty.

(7) We, the jury, find the accused (giving his name) guilty of manslaughter, and the other accused not guilty.

The judge says in his per curiam that he instructed the jury that they might render any one of the above-mentioned first four verdicts as to either one of the accused and render any other of the first four mentioned verdicts as to the other accused. Whether the judge gave this verbal instruction or not is of no importance, because the jury found both of the accused guilty of manslaughter. The only other verdicts which they might have rendered more favorable to the accused were: (1) To find them both not guilty, or (2) to find one of them guilty of manslaughter and the other not guilty. Both of these alternative verdicts were given in the written charge. The defendants cannot complain that the judge did not instruct the jury that they might find one of the accused guilty of manslaughter and find the other guilty as charged or guilty without capital punishment.

[7] Bill of exceptions No. 17 was reserved to the refusal of the judge to grant a new trial on account of the alleged misconduct of the jury and on account of a remark alleged to have been made by the deputy sheriff to the jury while they were deliberating.

The misconduct of the jury, alleged in the motion for a new trial, is that, while the jury was in the custody of the deputy sheriff, Scarborough, and while they were returning from a walk to their room, the foreman and the deputy sheriff stopped in the court-room while the other 11 jurors went into the jury room; and that the foreman told the deputy sheriff what had taken place in the deliberations and gave the names of the jurors who were holding out for a verdict different from that which was afterwards rendered.

The testimony shows that the door of the jury room was open, and that the foreman and the deputy sheriff were at all times in sight of the other 11 jurors. The district judge, who was acquainted with the location of the deputy sheriff and the foreman and the other 11 jurors, after hearing evidence, decided that the jurors were not so separated as to affect the legality of their verdict; and we defer to his judgment in this respect.

The motion for a new trial also alleges that the deputy sheriff went to the jury room and told the jurors that the people expected a verdict; that the case had already cost the parish a large sum of money and ought to be decided at once. The deputy sheriff testified, on the trial of the motion, that he had not made any such remark to the jury. It was Saturday night, and the jurors asked the deputy sheriff how long they would be held if they failed to agree to a verdict that night. The deputy told them that, if they did not report by six o'clock, they would go to supper, and then, if they failed to report by 12 o'clock, they would have to stay until Monday. One of the jurors spoke up and said that the case had cost the parish a lot of money and ought to be decided. The deputy further testified that his conversation with the foreman of the jury consisted of the foreman's asking if the judge would give the jury further instructions, and the deputy's reply that he would go and find the judge if the jury required further instructions. Three of the jurors were permitted to testify on the trial of the motion for a new trial, over the objection of the district attorney to allowing them to impeach their verdict. It has been repeatedly held that jurors should not be heard to impeach their verdict or to prove separation or misconduct on the part of the jury. State v. Cloud, 130 La. 955, 58 South. 827, Ann. Cas. 1913D, 1192; State v. Vicknair, 118 La. 963, 43 South. 635; State v. Cunningham, 123 La. 867, 49 South. 601; State v. Barrett, 117 La. 1086, 42 South. 513; State v. Hopkins, 115 La. 786, 40 South. 166; State v. Ferguson, 114 La. 70, 38 South. 23.

A motion for a new trial on the ground of misconduct of the jury addresses itself largely to the discretion of the trial judge, and his ruling will not be disturbed, unless manifest error and probable injury are shown. State v. Cloud, 130 La. 957, 58 South. 827, Ann. Cas. 1913D, 1192; State v. Irby, 131 La. 795, 60 South. 253; State v. Riggio, 124 La. 619, 50 South. 600; State v. Perioux, 107 La. 601, 31 South. 1016; State v. Garig, 43 La. Ann. 371, 8 South. 934.

We have failed to find any error in the proceeding had in the trial of this case. The verdict and sentence appealed from are therefore affirmed.